UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                              Case No. 05-10655-DHW
                                                   Chapter 7
DOUGLAS TRAVIS FAULK,

    Debtor.
_____

REGIONS BANK,

    Plaintiff,
v.                                                 Adv. Proc. No. 05-01070-DHW

DOUGLAS TRAVIS FAULK,

    Defendant.

MEMORANDUM OPINION

On July 13, 2005, Regions Bank ("Regions" or "bank") filed this complaint under 11 U.S.C. § 523(a)(2) to determine the dischargeability of its claim against the debtor/defendant, Douglas Travis Faulk ("Faulk" or "debtor"). The claim arises from two construction loans made in connection with Faulk's part-time business as a residential contractor. Regions contends that Faulk obtained the loans by actual fraud and that as a result, the debt is not dischargeable.

Trial was held in Dothan, Alabama on February 15, 2006. At trial, Regions was represented by Russell N. Parrish, and Faulk was represented by Collier H. Espy, Jr.

Jurisdiction

The court's jurisdiction in this adversary proceeding is derived from

28 U.S.C. § 1334 and from the general order of the United States District Court for this district referring title 11 matters to the Bankruptcy Court. Further, because this proceeding involves the dischargeability of a debt, it is a core proceeding thereby extending this court's jurisdiction to the entry of a final order or judgment. *See* 28 U.S.C. § 157(b)(2)(I).

## Factual Findings

For the last 11 years Faulk has been employed as a full-time security officer. In 1999, he began working part-time as a self-employed home contractor.

All of Faulk's construction projects have been financed by Regions. The first project involved a home renovation. When the project was completed, Regions was paid.

Next, Faulk purchased an acre of land on East Spring Street, Dothan, Alabama, and subdivided it into 6 lots on which he built 5 spec houses. Regions financed both the purchase of the land and the construction of the homes. Faulk paid off the construction loans with the proceeds of a loan from another institution which provided Faulk permanent financing. Faulk did not sell any of these homes. Rather, he retained the houses and lots as investment properties and rented them to tenants.

Next, Faulk built a home for one of his co-workers. Again, Regions financed the construction, and once the home was completed, Regions was paid from permanent financing provided by another lender.

Over the years, Faulk's relationship with Regions was good. Regions considered Faulk a good customer. Faulk had satisfactorily paid off all of his seven construction loans with Regions.

In June 2004, Faulk approached Regions for financing to build two homes in Hidden Lakes on Okeechobee Drive, Dothan, Alabama. Faulk had commitments from another lender for permanent financing once

2

construction was completed. Upon review of the estimates and appraisals, Regions agreed to finance the projects.

On June 14, 2004, Faulk signed two promissory notes each with a six-month maturity date. The notes were in the principal amounts of $124,870 and $124,681 and were secured by mortgages on 215 and 216 Okeechobee Drive.[1] In conjunction with the two promissory notes, the debtor signed two construction loan agreements. Each agreement contained the following provisions:

> Loan. . . . Borrower shall use the Loan Funds solely for the payment of: (A) the costs of constructing the Improvements and equipping the Project in accordance with the Construction Contract; (B) other costs and expenses incurred or to be incurred in connection with the construction of the Improvements as Lender in its sole discretion shall approve; and (C) if permitted by Lender, interest due under the Notes, including all expenses and all loan and commitment fees described in this Agreement.
>
> Loan Proceeds. [Borrower covenants to] Use the Loan Funds solely for payment of bills and expenses directly related to the Project.

Faulk maintained only one account at Regions Bank from 1999 forward. As Faulk made draws on the construction loans, Regions deposited the money into this checking account. In order to make a draw, Faulk simply telephoned the loan officer's secretary with the requested amount. Written draw sheets were not used and normally, Faulk did not

---

[1] The projected value at completion was between $146,000 and $148,000. The commitments for permanent financing upon completion of construction were around $131,000 per house.

3

specify the purpose of any particular draw.

From time to time, Faulk used the Regions account for purposes unrelated to construction. He did, however, make deposits into the Regions checking account from sources other than the construction loan proceeds. He also wrote checks on this account for expenses unrelated to construction. He testified that this was his common practice throughout his history with Regions.

Faulk began construction on the Okeechobee Drive houses in June 2004. On one occasion after construction had begun, Faulk told a Regions loan officer of an opportunity to save costs by prepaying for some lumber. Regions cooperated allowing Faulk to make an early draw.

Regions normally made a monthly inspection of the Okeechobee projects. Following each inspection, the inspector would ordinarily provide progress reports to Ted Gashaw, a Senior Vice-President of Regions who had charge of Faulk's loans. These inspection reports reflected the state of completion of the Okeechobee houses.

When the Okeechobee Drive loans came due at the end of October, they were renewed for an additional six months. It was not uncommon to renew a construction loan one time. Shortly after the loans were renewed, Regions' inspector alerted Gashaw that construction on the Okeechobee houses was not progressing as it should.

Also around this time, the debtor told Gashaw that he needed a draw to pay for trusses before they would be delivered. The trusses were scheduled for delivery within a few days. Gashaw authorized the draw, but the trusses were never delivered.[2]

---

[2] Faulk testified that he later elected to forego the purchase of prefab trusses and to build them himself. The decision to build trusses rather than to buy prefab ones was based upon the difference in the costs.

4

As a result of the unfavorable inspector's report, Gashaw began to review Faulk's bank account records. It was then that Gashaw discovered that Faulk had used some of the loan proceeds for purposes other than construction of the two homes.

Gashaw met with debtor. The debtor stated that he had used some of the money to help a family member in another state. Gashaw asked the debtor to provide a cost estimate of the amount necessary to complete the houses. According to Gashaw, one house was over 20% completed and the other was over 30% completed. The latter had been framed up with trusses, decking and felt but no shingles. The former had been merely framed up without trusses. It had no windows.

Regions agreed to allow the debtor time to obtain money to deposit into the account. The amount of that money is the subject of dispute. Regions contends that the debtor agreed to sell his East Spring Street properties and deposit $62,500 into the account. The debtor contends that Regions required the deposit of only $10,500 which he deposited in January 2005. The money was from the sale of one of the Spring Street houses. Regions deemed this amount insufficient and refused to release the December 2004 freeze on his account.[3]

By the end of December, the debtor had withdrawn about $92,200 on one loan and $88,200 on the other, exclusive of interest financing. The debtor had about $31,000 in draws remaining on one loan and $35,000 on the other. Regions did not allow any more draws on the loan.

The debtor expressed to Regions his desire to protect his credit. He had a commitment for the sale of the other houses on Spring Street, but the closing date was not imminent. The debtor sought to find other sources of financing. He was not able to do so by the deadline set by Regions, and

---

[3] When the account was frozen, there was very little money in the account. The balance on December 17, 2004 was $2,158.58. Only one deposit was made after that – the debtor's deposit of $10,500 discussed *infra*.

5

Regions foreclosed the debtor's interest in the two properties. Regions purportedly applied the $10,500 to the debt. The debtor did not receive the money.

Regions introduced the bank statements on the debtor's account from June 2004 to January 2005. The statements have a closing date in the middle of the month. The first draw for the loans in question was deposited into the account on June 16, 2004. Before the deposit, the account had a negative balance of $3,359.08. Regions points the court to the following activity in the account which it contends reflects that the debtor used the loan proceeds for purposes other than construction.

June Statement. Regions deposited one draw for each loan for a total of $30,335.00. The debtor made no deposits into the account.

July Statement. Regions deposited $39,400 into the account representing three draws in the amounts of $15,000, $4,000, and $20,400. The debtor made no deposits into the account.

The debtor wrote checks to mortgage companies in the following amounts: $472.84, $555, $475, $555, $560.89, and $550.[4] The debtor also wrote a $200 check to MBNA America which appears to be a credit card payment and a $131.57 check to Time Warner Cable.

He also made a $217.50 online payment to "SW Student SVC" and a $525 "bankcard" payment.

August Statement. Regions deposited $9,800 into the account representing six draws in the amounts of $2,500, $2,500, $800, $800, $1,600 and $1,600.

---

[4] The companies include Regions Mortgage, Countrywide Home Loans, Chase Manhattan Mortgage Corporation, Wells-Fargo Home Mortgage, and Washington Mutual.

6

Case 05-01070   Doc 18   Filed 07/14/06   Entered 07/14/06 15:21:09   Desc Main
Document       Page 6 of 17

The debtor deposited $4,858.91 representing three deposits in the amounts of $1,527.91, $1,400, and $1,931. These funds came from sources other than draws.

The debtor wrote checks to mortgage companies in the following amounts: $446.74, $554.48, and $560.89. He also wrote a $4,000 check to Woodchuck's,[5] a $300 check to Citibank and a $250 check to Mastercard.

September Statement. Regions deposited $32,400 into the account representing ten draws in the amounts of $500, $500, $2,700, $2,700, $3,200 and $3,200, $1,500, $1,500, $7,400 and $9,200.

The debtor deposited $950 representing two deposits in the amounts of $400 and $550. The debtor also deposited a $300 check from himself drawn on another bank which bounced.

The debtor wrote checks to mortgage companies in the following amounts: $560 and $490. He also wrote a $300 check to MBNA America and a $550 check to Robert Collier for "rent."

He also made a $277.50 online payment to "SW Student SVC," 2 $125 payments to Wells Fargo, a $980.65 payment to "Solink," and a $37.09 payment to "Well Suited," and a $1,725 card payment to Advanta. He also withdrew the $9,200 draw in cash or cashier's check. Gashaw recollects that the $9,200 was used to pay either child support or alimony.[6]

October Statement. Regions deposited $12,900 into the account

---

[5] The debtor testified that this check was a prepayment for cabinets on one of the houses. Woodchuck's required half up front before beginning construction of the cabinets.

[6] However, the debtor testified that he had not been behind on his child support payments at any time from 1999 to 2004.

representing three draws in the amounts of $5,400, $2,500 and $5,000.

The debtor deposited a $2,400 check from himself drawn on another bank which bounced.

The debtor wrote a $141.39 check to Time Warner Cable and made a $948.00 checkcard payment to "Crutchfield."

<u>November Statement</u>. Regions deposited $7,790 into the account representing two draws in the amounts of $1,200 and $6,590.

The debtor deposited $950 into the account. He also deposited a $600 check from himself drawn on another bank which bounced.

The debtor withdrew $9,850 in cash or cashier's checks. Regions records do not reflect the purpose for these withdrawals.

<u>December Statement</u>. Regions deposited $12,200 into the account representing two draws in the amounts of $9,000 and $3,200. The debtor made no deposits into the account.

The debtor wrote checks to mortgage companies in the following amounts: $484.31, $561.30, $545.30, $560, and $1,097.45. The debtor also wrote a $40.95 check to Postmaster, a $65 check to Mastercard, and a $3,235 check to himself for "labor."

The debtor made the following checkcard payments: $20.04 to Chili's, $25.81 to Hunts Seafood, and $48.30 to Applebee's, $476.75 to "SprintPCS," $455.28 to Lowe's, and $48.45 to Lowe's. He also made ATM withdrawals in the amount of $3.96 and $125.

<u>January Statement</u>. Regions deposited no draws into the account. The account had been frozen by the bank. The debtor deposited the $10,500 on January 6, 2005.

8

The above review is not exhaustive of the activity in the debtor's account for the relevant time periods. It reflects only those payments and withdrawals challenged by Regions as a misuse of the loan proceeds. On cross-examination, the debtor acknowledged that numerous other checks were also written for purposes other than construction. The deposits made by the debtor into this account were either from rent checks from his tenants, income from his full-time job, or payments from small jobs.[7]

In summary, Faulk used approximately $22,200 of the Regions' construction draw proceeds for his personal use rather than for construction on the project. However, Faulk deposited from other sources $17,258.91 into the Regions account. Hence, the net use of these funds for personal purposes is about $5,000. Of that amount, about $3,400 is comprised of the negative balance of the account prior to the beginning of this project. Therefore, Faulk's net personal use of the construction loan proceeds was about $1,600.

The debtor admittedly used a portion of the loan proceeds for purposes other than construction of the two houses. He testified that it was not emphasized to him that he could not use any draws to pay unrelated bills – either on the earlier projects or the later projects. Though contained in the contract, it was not discussed. He knew he was to use the loan proceeds solely for construction purposes, but it had been his practice to use this account for other purposes as well.

The loan officer testified that, when closing a construction loan, he normally informed the borrower as follows: "This agreement provides that you are to build the house using quality materials and workmanship and that the proceeds be used strictly for construction on that property." It was a habit with him. The loan officer did not remember if he specifically informed the debtor of this requirement in June 2004. However, they had a long relationship, and the debtor was familiar with Regions' loan

---

[7] The deposits do not appear to be direct payroll deposits from his full-time employer.

9

documents. The requirement was always understood.

The debtor made several deposits drawn on his accounts at other banks which bounced. The debtor stated that the deposits were based on his projection of rent from his tenants which he never in fact received. The checks to mortgage companies were in payment of the permanent financing on the Spring Street lots.

The debtor explained that he sometimes paid laborers directly in cash when requested by laborers. This was a common practice. This would explain checks by the debtor to himself for "labor" as well as other cash and ATM withdrawals. The debtor was not able to substantiate these withdrawals because he no longer has the records from his construction business.

Faulk testified that he prepaid for some services and materials, including bricks, drywall and cabinets for which he was never able to take delivery due to Regions' effectively stopping construction. These prepayments account for some of the shortfall between draws made and the stage of completion of the houses.

The debtor was also building his personal residence during a portion of this period of time. He wrote a few checks to cover expenses related to construction of his personal residence.

When he renewed the loans in November, he did not think the loans were in trouble. The debtor knew that he was using more money for personal use than he was depositing, but he thought that he had enough money to finish construction of the houses.[8]

---

[8] After the debtor renewed the loans, he received $12,200 in draws but did no work on the houses. In addition, while he deposited $950 into the account, he wrote checks of over $3,200 to mortgage companies.

10

Case 05-01070   Doc 18   Filed 07/14/06   Entered 07/14/06 15:21:09   Desc Main
Document      Page 10 of 17

He testified that he could have completed one of the houses based solely on the money remaining in the draw, especially with some of the prepayments he had made. He felt he could complete the other house based on the remaining draws, the $10,500 which he had deposited into the account, and if needed, the profits from the sale of the other Okeechobee home.

Conclusions of Law

A debt obtained by fraud is not dischargeable in bankruptcy. The statute provides in relevant part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .
>   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>     (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

An exception to discharge is to be strictly construed, and the creditor bears the burden of proving the exception.[9] *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986). Exceptions are construed strictly to give effect to the fresh start policy of the Bankruptcy Code. *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-65 (11th Cir. 1995). The creditor must prove each of the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d

---

[9] *See Equitable Bank v. Miller (In re Miller)* 39 F.3d 301, 304 (11th Cir. 1994). "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,'" recognizing that the "'reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *Id.* (citations omitted).

11

Case 05-01070   Doc 18   Filed 07/14/06   Entered 07/14/06 15:21:09   Desc Main
Document      Page 11 of 17

755 (1991).

To prevail on a claim under § 523(a)(2)(A), the creditor must prove that (1) the debtor made a false representation with intent to deceive the creditor, (2) the creditor relied on the representation, (3) the reliance was justified,[10] and (4) the creditor sustained loss as a result of the representation. *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 281 (11th Cir. 1995); *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998); *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996).

Promissory fraud is a subspecies of fraud with identical elements. *Tobin v. Sans Souci Ltd. P'ship (In re Tobin)*, 258 B.R. 199, 203 (B.A.P. 9th Cir. 2001). Promissory fraud is distinguished in that the "misrepresentation at issue is a promise made without intent to perform." *Id.* The District Court for the Northern District of Alabama has held that:

> The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or abstain from some act in the future . . . is when the evidence shows that, at the time . . . the promises of future action or abstention were made, the promisor had no intention of carrying out the promises, but rather had a present intent to deceive.

*Wade v. Chase Manhattan Mortgage Corporation*, 994 F. Supp. 1369, 1378 (N.D. Ala. 1997) (citing *Robinson v. Allstate Insurance Company*, 399 So. 2d 288 (Ala. 1981)). Further, "[t]he failure to perform, alone, is not evidence of intent not to perform at the time the promise was made . . . ." *Wade*, 994 F. Supp. at 1378 (citing *First Bank of Boaz v. Fielder*, 590 So. 2d

---

[10] Justifiable reliance, rather than the more stringent reasonable reliance or the more lenient actual reliance, is the standard in § 523(a)(2)(A) litigation. *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995); *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 281 (11th Cir. 1995).

12

893 (Ala. 1991), *overruled on other grounds*, *Life Ins. Co. v. Green*, 719 So. 2d 797 (Ala. 1998)). *See Capital Chevrolet v. Bullock (In re Bullock)*, 317 B.R. 885, 890 (Bankr. M.D. Ala. 2004) (holding that to succeed on a promissory fraud claim the creditor must prove that the debtor did not have the requisite intent to perform as promised at the time the promise was made).

Rarely will a party accused of promissory fraud admit the lack of intent to perform at the time the promise of future performance was made. In most instances, the court can only infer the defendant's intent by examining the surrounding circumstances in each particular case.

Regions contends that Faulk's use of the loan proceeds for purposes other than to build the two homes violated their construction loan agreements and amounted to promissory fraud. However, as stated above, the failure to perform alone is not sufficient to prove fraud. Regions must prove by a preponderance of the evidence that Faulk intended to breach the loan agreements on the date they were signed. Upon examination of the surrounding circumstances in this case, the court cannot conclude that the debtor intended to breach the contracts from their inception.

First, Faulk undertook construction to a significant extent. According to Regions, one house was over 20% complete the other over 30% complete. In addition, Faulk had pre-ordered and paid for materials that were not delivered prior to the construction shutdown. It follows that had these prepaid materials been delivered and installed, the degree of completion would have been higher. Further, about $66,000 remained undrawn under the construction loans lines of credit.

Second, there is no evidence that Faulk knew, at the time the loans were made, that he would encounter financial difficulty. The debtor had successfully completed seven construction projects with Regions financing. It appears that, to a large extent, the debtor's financial difficulty arose from his tenants' failure to pay rent on the Spring Street lots. The only evidence of financial difficulty at the time of the loans was the negative balance in his

13

Case 05-01070    Doc 18    Filed 07/14/06    Entered 07/14/06 15:21:09    Desc Main
Document    Page 13 of 17

account. However, Regions would have been aware of this negative balance.

Third, although Faulk used the bank account for purposes other than the construction loans, this had been a common practice for him during the course of his nine construction loans with the bank. The debtor not only made withdrawals from the account for other purposes, he also made deposits into the account from sources other than the construction loans. While this practice was neither prudent nor in accord with the loan agreements, the practice alone did not result in a misuse of the loan proceeds.

Regions has cited the court to its prior holding in *Southtrust Bank v. Moore (In re Moore)*, 2004 Bankr. LEXIS 2221 (Bankr. M.D. Ala. 2004). In that case this court found promissory fraud and held the debt nondischargeable.

There are indeed similarities in the present case to that of *Moore*. Moore, like Faulk, was a residential contractor. Moore had a longstanding relationship with a bank to provide construction financing for his various projects. Moore's contract with the bank included a provision that the construction loan proceeds would be used solely for construction. However, Moore, like Faulk, used the loan proceeds for other purposes.

But just as there are similarities in case at bar to that of Moore, there are glaring dissimilarities. First, the extent of the completion of construction factors heavily in the court's decision on whether the intent to deceive may be inferred. This court found that Moore had built a house of cards, in effect, using construction loans from current projects to pay debts related to older projects. In short, Moore was, as he described the situation, "robbing Peter to pay Paul" in essence kiting construction loans. In the end, at the time Moore acquired the loans in question, it was clear that barring an unlikely financial miracle, like a lottery win, Moore would be unable to repay his loans to the bank. Yet he continued to request and receive draws but did not spend the proceeds to further construction. In

14

fact, in one of his later projects, Moore had fully exhausted his construction loan line of credit of over $100,000 without beginning any construction.

However, as stated above, there is no evidence that Faulk was in financial difficulty when the two construction loans were made. In addition, Faulk undertook construction on the houses to a significant extent. These facts weigh against a finding that Faulk intended to deceive when the promise was made.

Another surrounding circumstance considered by the court in *Moore* was the debtor's efforts to remedy the default after its discovery. Although the debtor's post-default actions are not determinative of his intent at the time the promise was made, those actions do bear on the issue and aid the court in determining the debtor's intent.

In *Moore*, the debtor contended that had the bank merely worked with him, he ultimately would have been able to resolve his financial dilemma. In particular, in an alleged effort to remedy his default, Moore offered the bank an interest in his deceased mother's home. However, Moore's interest in that property was not exclusive; nor was the equity in the property of consequence compared to the amount of his debts.[11] Hence, Moore's offers to cure were all but hollow.

Faulk, like Moore, had a plan to cure once the default was discovered. Faulk believed that with the remaining, undrawn line of credit, about $66,000, plus proceeds from the sales of his investment realty, he could finish one of the Okeechobee Drive houses. Once the completed house was sold, Faulk believed that he could finish the other with the profits from that sale. Further, Faulk sought loans from personal acquaintances, who agreed to lend but could not accomplish the transaction prior to the deadline set by Regions.

---

[11] Moore's interest in his mother's estate was shared with at least one other sibling with whom Moore was somewhat estranged.

15

Admittedly, Faulk was in default under his contract with Regions. It follows that Regions was within its rights to terminate the contracts. However, Faulk offered a plausible plan to cure, not a mere pipedream as did Moore. Again, that Faulk made an offer of cure is not directly determinative of his intent to deceive as of the time the contract was made. Nevertheless, Faulk's post-default action bears upon this court's ability to infer fraudulent intent at the time of the contract. In summary, the court finds that Faulk's offer to cure the default represented a plausible plan and weighs against an inference of fraudulent intent.

Another surrounding circumstance this court considers in endeavoring to determine whether the debtor intended to deceive the bank is the sheer magnitude of the default. Though the amount of a default is not determinative of fraud one way or the other, it does bear on the debtor's knowledge of his financial difficulty and his post-transaction bona fides in dealing with the bank, both of which are relevant to his intent. In *Moore*, the debtor's obligation to the plaintiffs exceeded one-half of a million dollars. A substantial portion of that debt was incurred after Moore had reason to know of his financial difficulty. However, in the case *sub judice,* Faulk used around $22,000 of the construction loan proceeds for purposes other than construction. Yet, he deposited over $17,000 into the Regions checking account. These deposited funds were from sources other than construction loan draws. Aside from the $3,400 negative balance in the account that existed prior to these inception of the construction loan transactions, Faulk restored to the checking account all but about $1,600 of the loan proceeds used for non-construction purposes. This surrounding fact weighs against an inference of fraudulent intent at the time of the contract's making.

Finally, the court notes that in *Moore* there was substantial corroborating evidence of Moore's intent to defraud that is lacking in the case at bar. In *Moore*, the court heard evidence from a non-party bank which had also furnished Moore with construction financing during the relevant time frame. That evidence showed that Moore made false statements to a non-party lender in order to induce an additional advance

16

above the original line of credit. This evidence of fraud by Moore against another entity led this court to an inference of his fraudulent intent with respect to the plaintiff in that case. Corroborating evidence of other similar fraud is not a part of the record in this case weakening any inference of fraud by Faulk.

## Conclusion

For these reasons, the court finds that Regions has not proved fraud by a preponderance of the evidence. A separate order will enter pursuant to Fed. R. Bankr. Proc. 9021 holding that Faulk's debt to Regions is dischargeable.

Done this the 14th day of July, 2006.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Russell N. Parrish, Attorney for Plaintiff
   Collier H. Espy, Jr., Attorney for Defendant